UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| JASON MONROE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:19-cv-00392-JAR |
| | ) | |
| ANNE PRECYTHE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter comes before the Court on review of plaintiff Jason Monroe's amended complaint pursuant to 28 U.S.C. § 1915. Having reviewed the amended complaint, and for the reasons discussed below, the Court will dismiss this action without prejudice. *See* 28 U.S.C. § 1915.

### Legal Standard on Initial Review

Under 28 U.S.C. § 1915(e)(2), the Court is required to dismiss a complaint filed in forma pauperis if it is frivolous, malicious, or fails to state a claim upon which relief can be granted. To state a claim under 42 U.S.C. § 1983, a plaintiff must demonstrate a plausible claim for relief, which is more than a "mere possibility of misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678. Determining whether a complaint states a plausible claim for relief is a context-specific task that requires the reviewing court to draw upon judicial experience and common sense. *Id*. at 679. The court must "accept as true the facts alleged, but not legal conclusions or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Barton v. Taber*, 820

F.3d 958, 964 (8th Cir. 2016). *See also Brown v. Green Tree Servicing LLC*, 820 F.3d 371, 372-73 (8th Cir. 2016) (stating that court must accept factual allegations in complaint as true, but is not required to "accept as true any legal conclusion couched as a factual allegation").

When reviewing a pro se complaint under § 1915(e)(2), the Court must give it the benefit of a liberal construction. *Haines v. Kerner*, 404 U.S. 519, 520 (1972). A "liberal construction" means that if the essence of an allegation is discernible, the district court should construe the plaintiff's complaint in a way that permits his or her claim to be considered within the proper legal framework. *Solomon v. Petray*, 795 F.3d 777, 787 (8th Cir. 2015). However, even pro se complaints are required to allege facts which, if true, state a claim for relief as a matter of law. *Martin v. Aubuchon*, 623 F.2d 1282, 1286 (8th Cir. 1980). *See also Stone v. Harry*, 364 F.3d 912, 914-15 (8th Cir. 2004) (stating that federal courts are not required to "assume facts that are not alleged, just because an additional factual allegation would have formed a stronger complaint"). In addition, affording a pro se complaint the benefit of a liberal construction does not mean that procedural rules in ordinary civil litigation must be interpreted so as to excuse mistakes by those who proceed without counsel. *See McNeil v. United States*, 508 U.S. 106, 113 (1993).

### Background

Plaintiff is a pro se litigant currently incarcerated at the Farmington Correctional Center (FCC) in Farmington, Missouri. On February 28, 2019, he filed a civil action pursuant to 42 U.S.C. § 1983. (Docket No. 1). The complaint named twenty separate defendants: Paul Blair; Bill Bowyer; Anita Clarke; Shannon Clubb; Alan Earls; Lindell Edmonds; Unknown Ezersky; Unknown Griffin; M. Hinkle; Coel Jackson; Kristin Johnson; Teri Lawson; George Lombardi; Mark Mills; Brady Payne; Unknown Pickett; Anne Precythe; Stephen Spitzmiller; Ian Wallace; and Tammi White.

In the complaint, plaintiff alleged that he suffered paruresis, a social anxiety disorder that makes him unable to provide urine specimens for purposes of urinalyses. (Docket No. 1 at 7). As a result, plaintiff claimed that he was terminated from the Missouri Sex Offender Program (MOSOP) and was not allowed parole. (Docket No. 1 at 11-12). Plaintiff generally stated that defendants had not conducted urinalysis procedures in a manner consistent with "Policy D5-7.1" of the Missouri Department of Corrections (MODOC). (Docket No. 1 at 7). Specifically, plaintiff asserted that he was entitled to the use of a catheter for urinary analysis. (Docket No. 1 at 11). Plaintiff claimed that defendants were deliberately indifferent to his "medical/mental health needs," which amounted to cruel and unusual punishment. (Docket No. 1 at 10). He also alleged that his due process rights had been violated. (Docket No. 1 at 12).

Plaintiff sought an order forcing MODOC to adhere to Policy D5-7.1 and to create a policy to accommodate offenders suffering from paruresis. (Docket No. 1 at 9). He also requested immediate release from custody, as well as monetary damages.

On March 2, 2019, plaintiff sent a letter to the Court that was construed as a motion to amend by interlineation. (Docket No. 2). In the motion, plaintiff sought to add four more defendants.

The Court denied plaintiff's motion to amend by interlineation on July 18, 2019. (Docket No. 6). The Court also noted certain deficiencies in the complaint, including the failure to assert factual allegations against various defendants, and a heavy reliance on legal conclusions. Because plaintiff was a self-represented litigant, the Court gave him the opportunity to file an amended complaint. Plaintiff was provided instructions on how to do so, and he was sent a copy of the Court's civil rights complaint form. He was given thirty days in which to comply, and was advised that failure to submit an amended complaint would result in the dismissal of his action. The Court

3

also advised plaintiff that when his amended complaint was received, it would be reviewed pursuant to 28 U.S.C. § 1915. The Court further noted that the filing of an amended complaint would completely replace the original complaint.

On August 5, 2019, plaintiff timely filed an amended complaint.

### The Amended Complaint

Plaintiff's amended complaint is brought pursuant to 42 U.S.C. § 1983. It is handwritten on a Court-provided form. The amended complaint is thirty-four pages long, and contains an additional thirty-four pages of exhibits, which include informal resolution requests (IRR), IRR responses, grievances, grievance responses, grievance appeals, grievance appeal responses, a classification hearing form, and a number of letters from Scott O'Kelley, who is MODOC's assistant division director for mental health services.[1]

The amended complaint names eighteen separate defendants:[2] MODOC Director Anne Precythe; Warden Terri Lawson; Assistant Warden Bill Bowyer; Sergeant Unknown Ezersky; Caseworker Kristen Johnson; Functional Unit Manager (FUM) M. Hinkle; Caseworker Unknown Pickett; Sergeant Unknown Griffith; Ex-MODOC Director George Lombardi; MOSOP Assistant Clinical Director Erin Gould; Manger of MOSOP Operations Steve Pfister; MOSOP Clinical Director Amy Griffith; Therapist Dena Boyd; Therapist E. Engers; Caseworker Lindell Edmonds; Caseworker Robert Killian; Caseworker Unknown White; and MODOC Assistant Division Director of Mental Health Services Scott O'Kelley. (Docket No. 7 at 2-6). Defendants Precythe, Lawson, Lombardi, Gould, Pfister, Amy Griffith, and O'Kelley are sued in both their official and

---

[1] The Court has reviewed these attachments and will treat them as part of the pleadings. *See* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is part of the pleading for all purposes").

[2] There are actually nineteen defendants listed. However, Sergeant Griffith, the urinalysis coordinator, appears twice.

individual capacities. Plaintiff does not indicate the capacity in which defendant Johnson is sued. The remaining defendants are sued in their individual capacities only.

Plaintiff's amended complaint is long, names numerous defendants, and encompasses several different incidents occurring from 2016 to 2019. The general thrust of plaintiff's amended complaint is that he was wrongfully terminated from MOSOP because he was unable to provide a urine sample, was later reinstated to MOSOP when the warden expunged his conduct violations, but was eventually terminated from MOSOP a second time, which plaintiff believes was retaliatory.

In the amended complaint, plaintiff states that he has been an inmate at FCC since December 2015. (Docket No. 7 at 6). During that time, he states that he has been subjected to eight attempted urine specimen collections. On four occasions, he has been able to give a sample, twice by catheter, and twice by urinating without observation. On December 2, 2016, however, no accommodation was given, and he received a conduct violation. This resulted in him being placed in disciplinary segregation. On December 22, 2016, another collection was attempted without an accommodation, and again he received a conduct violation. The December 22, 2016 conduct violation was later dismissed because plaintiff had a medical lay-in. Specifically, plaintiff states that he suffers from paruresis, a mental health condition that makes him unable to urinate in the presence of others. (Docket No. 7 at 7).

On January 15, 2018 and January 21, 2018, two further collections were attempted without an accommodation. (Docket No. 7 at 6). On January 26, 2018, plaintiff was found guilty of the resulting conduct violations. As a result, he was placed in disciplinary segregation for fifteen days, was referred to administrative segregation indefinitely, was terminated from MOSOP, and lost his "time credit date" of October 5, 2018. (Docket No. 7 at 7). Plaintiff states that defendants failed to

5

comply with MODOC Policy D5-7.1, which provides that hair testing may be used for inmates who cannot provide a sample due to medical or mental health reasons.

Plaintiff filed an IRR, and then a grievance, challenging the conduct violations he was issued on January 15, 2018 and January 21, 2018. On March 7, 2018, the warden overturned the conduct violations. It was also recommended that plaintiff be transferred back to MOSOP. Plaintiff states that he rejoined MOSOP on March 8, 2018, but that he was not "returned to the same curriculum group or point of progress." (Docket No. 7 at 7-8).

Plaintiff states that he "confronted" Therapist Boyd in the third week of March 2018. (Docket No. 7 at 8). According to plaintiff, Boyd informed him that he had been reassessed, and that his quickest way to complete the program was to start over. Plaintiff alleges that Boyd assured him that he would be done by October 10, 2018, which would be his 365th day in treatment. However, after orientation, plaintiff was placed with a new therapist. This "alarmed and concerned" plaintiff, so he contacted his family, who in turn contacted Assistant Division Director O'Kelley. After that, plaintiff claims that the "retaliation started."

As to MODOC Director Precythe, plaintiff alleges that Precythe, in her official capacity, failed to train employees with regard to urinalysis and specimen collection and in hosting "disciplinary hearings in a manner that does not impede upon offenders['] right to due process." (Docket No. 7 at 9). He also states that Precythe, in her official capacity, "failed to construct impartial panels or committees to host disciplinary hearings[,] resulting in violations of due process rights." Furthermore, plaintiff claims that Precythe, acting in her individual capacity, failed to respond to or investigate complaints he sent to her.

As to Warden Lawson, plaintiff asserts that Lawson, in her official capacity, was deliberately indifferent to plaintiff's "disability and mental health need[s] by knowingly and

unintelligently allowing" him to be punished for failing to produce a urine specimen. (Docket No. 7 at 9-10). Plaintiff further claims that Lawson, in her official capacity, failed to train her employees in the proper procedure of disciplinary hearings, and in the proper drug testing procedures. (Docket No. 7 at 10).

As to Assistant Warden Bowyer, plaintiff alleges that Bowyer, acting in his individual capacity, upheld sanctions imposed due to a medical condition, allowing cruel and unusual punishment to occur. (Docket No. 7 at 11). Plaintiff also states that Bowyer failed to protect him from First Amendment retaliation after he provided Bowyer with "evidence of retaliation for filing grievances." Furthermore, plaintiff asserts that Bowyer signed off on an IRR that had been answered by Clinical Director Griffith, who plaintiff states is a "compromised conspirator."

As to Sergeant Ezersky, plaintiff alleges that Ezersky, acting in his individual capacity, violated plaintiff's Eighth Amendment rights. (Docket No. 7 at 12). Specifically, on January 15, 2018, Sergeant Ezersky met plaintiff in medical, where plaintiff had been taken to collect a urine specimen. Plaintiff gave his medical lay-in to Correctional Officer Mark Mills, but Sergeant Ezersky had a document showing that plaintiff's lay-in had expired. Therefore, Sergeant Ezersky instructed plaintiff to go into the medical restroom, remove his shirt, pants, and boxers, and provide a specimen. Plaintiff states that the restroom door was open, that the restroom was in "plain view" of quarantined offenders, and that female staff members were "in the immediate area." He alleges that Sergeant Ezersky's actions failed to comply with MODOC Policy D5-7.1. When plaintiff failed to produce a specimen, Sergeant Ezersky issued a conduct violation.

As to Caseworker Johnson, plaintiff states that Johnson was the hearing officer at a disciplinary hearing held on December 7, 2016. Plaintiff admits that he pleaded guilty to the violation at the time of the interview, the night when the attempted collection occurred. However,

plaintiff states that he pleaded guilty after conversing with Sergeant Brawley and Sergeant Clubbs, wherein he advised the sergeants that he had paruresis. (Docket No. 7 at 12-13). According to plaintiff, Sergeant Clubbs told him to tell Johnson that plaintiff was "not to be sent to segregation and to contact him." (Docket No. 7 at 13). At the hearing, Johnson found plaintiff guilty of a conduct violation. (Docket No. 7 at 12). Plaintiff asserts that Johnson violated his right to due process because she did not contact Sergeant Clubbs. (Docket No. 7 at 13). He also contends that his statement to Johnson, in which he told her that he cannot urinate in front of people, "substantiates that an alternative collection should have occurred."

As to FUM Hinkle, plaintiff states that Hinkle, acting in her individual capacity, inflicted cruel and unusual punishment on him, and also violated his right to due process. (Docket No. 7 at 14). He explains that in October 2017,  plaintiff went to Hinkle's office and told her about his fear of being terminated from MOSOP due to paruresis and his "inability to provide a urine sample in the presence of others." (Docket No. 7 at 13-14). Plaintiff attempted to present "documentation on the disease," but Hinkle declined, stating that if plaintiff had any issues, she would dismiss the resulting violations. Thereafter, in January 2018, plaintiff received conduct violations, which he presented to Hinkle. (Docket No. 7 at 14). Hinkle, however, declined to dismiss the violations.

As to Caseworker Pickett, plaintiff alleges that Pickett, acting in an individual capacity, violated his right to due process by withholding evidence during a disciplinary hearing. In particular, plaintiff claims that Pickett "refused to provide [him] an alleged statement by a Doctor." He further states that "[w]ithout knowledge of a statement there exist[s] no opportunity for redress."

As to Sergeant Griffith, plaintiff states that Sergeant Griffith was the urinalysis coordinator in January 2018. (Docket No. 7 at 14-15). He alleges that Sergeant Griffith, acting in his individual

capacity, failed to train his subordinates in conducting urine specimen collection in a manner "consistent with established policy D5-7.1." (Docket No. 7 at 15). He further claims that Sergeant Griffith failed to accommodate his disability, resulting in cruel and unusual punishment. (Docket No. 7 at 27).

As to Ex-MODOC Director Lombardi, plaintiff alleges that Lombardi, acting in his official capacity, failed to train his employees on conducting disciplinary hearings, and failed to train his employees in conducting drug testing. (Docket No. 7 at 15). Plaintiff also states that Lombardi, acting in his individual capacity, was deliberately indifferent to his mental health needs and failed to "provide auxiliary aids for [his] disability," even though plaintiff wrote him "multiple times."

As to Assistant Clinical Director Gould, plaintiff alleges that Gould, acting in her individual capacity, violated the First Amendment by retaliating against him for filing grievances. (Docket No. 7 at 16). Plaintiff states that in May 2018, Gould came onto E-wing "berating, chastising, and shaming" him, including making "derogatory statements about [his] abilities as a parent." This took place after Assistant Division Director O'Kelley "was contacted about [plaintiff's] placement in the [MOSOP] program after [his return] on" March 8, 2018. Plaintiff states that Gould made her comments in the presence of other offenders. On this same occasion, plaintiff asserts that Gould made a "snarky" statement about him returning to "module 4." Plaintiff notes that prior to being terminated from MOSOP, he had completed module 4, and that when he was sent back to orientation upon readmittance, he went to module 2. Plaintiff claims that his new therapist "confided" in him that "management told her to treat [him] as if [he] was never in the program." Plaintiff further contends that "Gould was management."

In June 2018, plaintiff again wrote Assistant Division Director O'Kelley. After this letter, plaintiff states he was "summoned to a room" by Gould and MOSOP Manager of Operations

Pfister. (Docket No. 7 at 16-17). Plaintiff says he was "ordered" to sit, whereupon Gould and Pfister, who were standing above him, informed plaintiff that his grievance had been received in Jefferson City and an investigation started. (Docket No. 7 at 17).

On August 2, 2018, Gould held a "special process group" in lieu of the normally scheduled process group. The purpose of the group was to discuss plaintiff's letters to O'Kelley. Plaintiff states that he was "persecuted for failing to provide a urine sample," and was told that writing O'Kelley was "offense parallel," in that it displayed treatment needs and interfered with his treatment. Gould informed the group that "having to host this group was impeding upon their progress." Plaintiff "felt this was [an] attempt to isolate [him] from the group." He also states that Gould "taunted" him by stating that she "did not get in trouble."

On December 19, 2018, plaintiff "received a treatment referral for a program review." The listed reason for the referral was the pattern of both plaintiff and his family filing grievances. According to plaintiff, "Gould insisted [he] wrote all the grievances because [he] had a false perception of being wronged." (Docket No. 7 at 19). Furthermore, plaintiff states that Gould and Pfister believed that his mother "was bad for [his] support system" because she believed that plaintiff was innocent. Plaintiff acknowledges that there were other reasons for the referral; however, he contends those "other claims are false and unsubstantiated."

On February 20, 2019, plaintiff received a second treatment team referral. This occurred a day after plaintiff's mother contacted Assistant Division Director O'Kelley "to see what was going on." Plaintiff states that the second referral was for his "offense chain being [too] much like an autobiography and not taking accountability for [plaintiff's] crime." (Docket No. 7 at 18). However, plaintiff asserts that he had presented his offense chain to two different therapists, and was never instructed to redo it. He further states that he received therapy from several different

10

therapists, and each "of them had different expectations and instructions for assignments." Plaintiff states that he eventually removed historical information from his offense chain and turned it in on January 28, 2019. (Docket No. 7 at 18, 20). The offense chain was never returned and plaintiff did not hear about it again until the second referral on February 20, 2019.

Plaintiff states that the hearing on the referral was held on February 26, 2019, with the panel consisting of Gould, Manager of Operations Pfister, and Caseworker White. (Docket No. 7 at 20). The hearing revolved "around perceptions of [plaintiff's] mother, grievances, and other assignments not listed in the referral." Plaintiff states that he was terminated from MOSOP on February 28, 2019.

Beyond the First Amendment retaliation claim, plaintiff alleges that Gould, acting in her individual capacity, violated his right to due process under the Fifth and Fourteenth Amendments. In particular, plaintiff claims that "Gould failed to provide statements of evidence to be used for the disciplinary hearings resulting from" the two referrals plaintiff received. Plaintiff also states that Gould "failed to provide an impartial committee for the disciplinary hearings" and "withheld exculpatory evidence." Plaintiff further asserts that Gould, in her individual capacity, violated the Eighth Amendment and due process by "providing materially and factually false statements" to O'Kelley.

Plaintiff also alleges that Gould, acting in her official capacity, violated his right "to due process by failing to provide an impartial panel for [his] treatment team disciplinary hearings in 2018 and 2019." (Docket No. 7 at 20-21).

As to MOSOP Manager of Operations Pfister, plaintiff alleges that Pfister, acting in his individual capacity, violated the First Amendment by retaliating against him "for filing grievances and maintaining correspondence with O'Kelley." (Docket No. 7 at 21). Similar to the accusation

11

against Gould, plaintiff states that Pfister was present when plaintiff was summoned in June 2018 to be told that his grievance had made it to Jefferson City and was being investigated. Plaintiff contends that during this conversation, "Pfister and Gould stood above [him] in an intimidating manner." Later, in August 2018, Pfister summoned plaintiff to threaten him "with termination and disciplinary segregation" for sharing a letter he received from O'Kelley with another offender. Plaintiff admits that he shared this response so that the other offender could prepare an IRR. Nevertheless, plaintiff states that these two events constituted threatening behavior that violated the First Amendment. (Docket No. 7 at 22). He also claims that Pfister was "complicit in retaliatory treatment team referrals."

Plaintiff further states that Pfister, acting in his individual capacity, violated plaintiff's right to due process by failing "to provide an impartial panel for [his] treatment team hearings," failing "to provide exculpatory evidence," and responding to IRRs in which he was accused of wrongdoing.

Plaintiff also claims that Pfister, while acting in his official capacity, "failed to provide an impartial panel to conduct the treatment team hearings."

As to Clinical Director Griffith, plaintiff alleges that Griffith, acting in her individual capacity, violated his right to due process and the Eighth Amendment by responding "to an IRR written on her direct subordinate." After the IRR hearing, which was held on March 28, 2019, plaintiff further states that Clinical Director Griffith failed to provide him a grievance form. (Docket No. 7 at 23). Plaintiff claims that Clinical Director Griffith later issued a written report that "made materially false statements in [an] attempt to cover up or justify Gould and Pfister" terminating him from MOSOP. He also accuses Clinical Director Griffith of conspiring with Gould and Pfister "to manufacture false claims to substantiate [his] termination from M.O.S.O.P."

Furthermore, plaintiff alleges that Clinical Director Griffith, acting in her official capacity, "failed to provide an impartial panel for [his] treatment team hearings in December of 2018 and January of 2019."

As to Therapist Boyd, plaintiff alleges that Boyd, in her individual capacity, allowed him to be cruelly and unusually punished in violation of the Eighth Amendment. (Docket No. 7 at 24). He asserts that he informed Boyd about his paruresis, and his fear of being terminated from MOSOP, on October 10, 2017. He also offered to provide Boyd with information on his condition, but she declined. Instead, she advised plaintiff that they "would deal with the issue when it occurred." Plaintiff asserts this amounted to deliberate indifference of his serious mental health needs. Plaintiff further accuses Boyd of conspiring with Gould to have him restart MOSOP from the beginning after he returned in March 2018.

As to Therapist Engers, plaintiff alleges that Engers, acting in an individual capacity, conspired with Gould to retaliate against plaintiff for filing grievances. He states that "Engers made multiple comments in groups about grievances," "misrepresented material facts" on the two treatment team referrals," and "listed grievances on a referral." (Docket No. 7 at 24-25). As such, plaintiff asserts that Engers retaliated against him in violation of his rights under the First Amendment. (Docket No. 7 at 25).

As to Caseworker Edmonds, plaintiff alleges that Edmonds, acting in an individual capacity, "failed to provide a fair and impartial panel" for his treatment team hearing, and "failed to protect [him] from Gould and Pfister[']s blatant retaliation." In support, plaintiff states that he attempted to explain to Edmonds what was going on, but "Edmonds failed to take corrective action." Thus, plaintiff asserts that Edmonds has violated his Eighth and Fourteenth Amendment rights.

As to Caseworker Killian, plaintiff claims that Killian, acting in his individual capacity, violated his rights under the First, Eighth, and Fourteenth Amendments. (Docket No. 7 at 25-26). He states that he attempted to speak with Killian on February 24, 2019, about the purported retaliation he was receiving. (Docket No. 7 at 25). Killian, however, dismissed him. Thereafter, on February 28, 2019, Killian signed off as the committee chairperson for his hearing, even though he was not present. (Docket No. 7 at 26). Plaintiff also states that Killian failed to provide an impartial panel.

As to Caseworker White, plaintiff alleges that White, acting in an individual capacity, "failed to provide a fair and impartial hearing panel on" February 26, 2019, "allowed the hearing stray from the written reason," "failed to provide a written statement of evidence relied upon," and "failed to provide exculpatory evidence." Plaintiff asserts that White's actions violated his right to due process.

Finally, as to Assistant Division Director O'Kelley, plaintiff states that O'Kelley, acting in his official capacity, was deliberately indifferent to the alleged retaliation plaintiff received in MOSOP. Plaintiff claims that "O'Kelley failed to take corrective action even after [he] provided evidence that Gould was evasive, deceptive and lied in her written responses." He asserts that O'Kelley's failure to act amounted to a violation of his Eighth Amendment right to be free from cruel and unusual punishment. (Docket No. 7 at 26-27).

Plaintiff further alleges that O'Kelley, acting in his individual capacity, failed to ensure that plaintiff received due process, "failed to provide fair and impartial hearings," "failed to provide an impartial panel," "failed to train his subordinates," and failed to investigate Gould and Pfister's behaviors. (Docket No. 7 at 27).

14

In terms of relief, plaintiff is "seeking reinstatement of [his] Time Credit Release and Immediate release from Custody." (Docket No. 7 at 28). He also wants the Court to issue an order directing MODOC to comply with "Policy D5-7.1." Monetarily, plaintiff requests $100 a day for "the unjust time" he spent in segregation, as well as $210 a day from October 5, 2018 until his release from custody. Furthermore, plaintiff seeks $250,000 from the Corizon Health Care employees for "malpractice, libel, and slander," $100,000 for mental duress, and reimbursement of $350 for his filing fees. (Docket No. 7 at 29).

The Court will treat the amended complaint as the operative pleading, replacing plaintiff's original complaint. *See In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 928 (8th Cir. 2005) ("It is well-established that an amended complaint supercedes an original complaint and renders the original complaint without legal effect").

## Discussion

Plaintiff is a pro se litigant who brings this action pursuant to 42 U.S.C. § 1983. His amended complaint names eighteen separate defendants, some of whom are sued in both their individual and official capacities, while others are sued in an individual capacity only. As will be discussed below, plaintiff's allegations fail to state a claim. Therefore, this action will be dismissed without prejudice.

### A.  Official Capacity Claims

Plaintiff has sued defendants Precythe, Lawson, Lombardi, Gould, Pfister, Amy Griffith, and O'Kelley in their official capacities. In an official capacity claim against an individual, the claim is actually "against the governmental entity itself." *See White v. Jackson*, 865 F.3d 1064, 1075 (8th Cir. 2017). Thus, a "suit against a public employee in his or her official capacity is merely a suit against the public employer." *Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th

Cir. 1999). *See also Brewington v. Keener*, 902 F.3d 796, 800 (8th Cir. 2018) (explaining that official capacity suit against sheriff and his deputy "must be treated as a suit against the County"); *Kelly v. City of Omaha, Neb.*, 813 F.3d 1070, 1075 (8th Cir. 2016) (stating that a "plaintiff who sues public employees in their official, rather than individual, capacities sues only the public employer"); and *Elder-Keep v. Aksamit*, 460 F.3d 979, 986 (8th Cir. 2006) (stating that a "suit against a public official in his official capacity is actually a suit against the entity for which the official is an agent").

Here, Precythe, Lawson, Lombardi, and O'Kelley are alleged to be employed by MODOC, a department of the State of Missouri, while Gould, Pfister, and Amy Griffith are alleged to be employed by Corizon. Thus, plaintiff's official capacity claims against these defendants are actually claims against MODOC and Corizon, respectively.

### i.      Official Capacity Claims Against MODOC Employees

As discussed above, the official capacity claims against the MODOC employees are actually claims against their employer. That is, plaintiff's official capacity claims against Precythe, Lawson, Lombardi, and O'Kelley are actually claims against the State of Missouri, of which MODOC is a department. "Section 1983 provides for an action against a 'person' for a violation, under color of law, of another's civil rights." *McLean v. Gordon*, 548 F.3d 613, 618 (8th Cir. 2008). *See also Deretich v. Office of Admin. Hearings*, 798 F.2d 1147, 1154 (8th Cir. 1986) (stating that "[§] 1983 provides a cause of action against persons only"). However, "neither a State nor its officials acting in their official capacity are 'persons' under § 1983." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). *See also Calzone v. Hawley*, 866 F.3d 866, 872 (8th Cir. 2017) (stating that a "State is not a person under § 1983"); and *Kruger v. Nebraska*, 820 F.3d 295, 301 (8th Cir. 2016) (asserting that "a state is not a person for purposes of a claim for money damages

16

under § 1983"). Therefore, to the extent that plaintiff is seeking monetary damages, plaintiff's official capacity claims against the MODOC employees must be dismissed.

To the extent that plaintiff is seeking prospective injunctive relief, his claims still fail.[3] In order to prevail on an official capacity claim, plaintiff must establish the governmental entity's liability for the alleged conduct. *See Kelly*, 813 F.3d at 1075. Such liability may attach if the constitutional violation resulted from (1) an official policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train or supervise. *See Mick v. Raines*, 883 F.3d 1075, 1079 (8th Cir. 2018). *See also Marsh v. Phelps Cty.*, 902 F.3d 745, 751 (8th Cir. 2018) (recognizing "claims challenging an unconstitutional policy or custom, or those based on a theory of inadequate training, which is an extension of the same"). Thus, there are three ways in which plaintiff can potentially prove MODOC's liability.

First, plaintiff can show the existence of an unconstitutional policy. "Policy" refers to "official policy, a deliberate choice of a guiding principle or procedure made by the…official who has final authority regarding such matters." *Corwin v. City of Independence, Mo.*, 829 F.3d 695, 700 (8th Cir. 2016). For a policy that is unconstitutional on its face, a plaintiff needs no other evidence than a statement of the policy and its exercise. *Szabla v. City of Brooklyn, Minn.*, 486 F.3d 385, 389 (8th Cir. 2007). However, when "a policy is constitutional on its face, but it is asserted that a [governmental entity] should have done more to prevent constitutional violations by its employees, a plaintiff must establish the existence of a 'policy' by demonstrating that the

---

[3] Part of the relief that plaintiff seeks is immediate release from custody. Such relief is not available pursuant to 42 U.S.C. § 1983. In order to request immediate release, plaintiff must file a petition for writ of habeas corpus. *See Preiser v. Rodriguez*, 411 U.S. 475, 500 (1973) (stating that "when a state prisoner is challenging the very fact or duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to immediate release or a speedier release from that imprisonment, his sole federal remedy is a writ of habeas corpus"). *See also Adams v. Agniel*, 405 F.3d 643, 644-45 (8th Cir. 2005) (explaining that a habeas action is the proper vehicle for a prisoner to challenge the legality of his sentence or seek immediate or speedier release); and *Otey v. Hopkins*, 5 F.3d 1125, 1130 (8th Cir. 1993) (stating that when "a prisoner directly attacks the validity of his sentence, the proper vehicle is a habeas corpus action").

inadequacies were a product of deliberate or conscious choice by the policymakers." *Id*. at 390.

A policy may be either a policy statement, ordinance, regulation, or decision officially adopted

and promulgated by the governing body of the entity. *See Angarita v. St. Louis Cty.*, 981 F.2d

1537, 1546 (8th Cir. 1992).

Second, plaintiff can establish a claim of liability based on an unconstitutional "custom."

In order to do so, plaintiff must demonstrate:

> 1)  The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;
>
> 2)  Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and
>
> 3)  That plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation.

*Johnson v. Douglas Cty. Med. Dep't*, 725 F.3d 825, 828 (8th Cir. 2013).

Finally, plaintiff can assert a governmental liability claim by establishing a deliberately

indifferent failure to train or supervise. To do so, plaintiff must allege a "pattern of similar

constitutional violations by untrained employees." *S.M. v. Lincoln Cty.*, 874 F.3d 581, 585 (8th Cir.

2017).

A plaintiff does not need to specifically plead the existence of an unconstitutional policy

or custom. *Crumpley-Patterson v. Trinity Lutheran Hosp.*, 388 F.3d 588, 591 (8th Cir. 2004).

However, at a minimum, the complaint must allege facts supporting the proposition that an

unconstitutional policy or custom exists. *Doe ex rel. Doe v. Sch. Dist. of City of Norfolk*, 340 F.3d

605, 614 (8th Cir. 2003).

In this case, plaintiff does direct the Court to a specific MODOC policy, which he identifies as Policy D5-7.1. According to plaintiff, this policy allows for hair testing in lieu of urine screens for those inmates who, due to a medical or mental health condition, cannot provide a specimen. While he contends that this policy was violated with regard to him, he does not assert that the policy itself is unconstitutional on its face, or that any inadequacies in the policy were a product of deliberate or conscious choice by the policymakers. Thus, plaintiff has not sufficiently alleged the existence of an unconstitutional policy.

Plaintiff has also failed to demonstrate that MODOC had an unconstitutional custom. Though he has stated that the MODOC policy regarding urine screens was violated, he has not presented facts showing "a continuing, widespread, persistent pattern of unconstitutional misconduct" by MODOC employees, much less that this misconduct occurred with the tacit authorization of policymaking officials. Rather, plaintiff points to only four occasions in which he was not provided an accommodation in providing a urine sample. On three of those four occasions, after it was determined that plaintiff had a valid medical lay-in, the conduct violations he received were expunged. On the fourth occasion, plaintiff's own exhibits show that he did not have a valid medical lay-in. These facts do not support the contention that MODOC policymaking officials were tacitly authorizing widespread unconstitutional employee conduct.

Finally, plaintiff has not established that MODOC was deliberately indifferent toward training or supervising its employees. Several times in the amended complaint, plaintiff asserts failure to train claims against MODOC officials. None of his allegations, however, go beyond providing the name of the claim, and concluding that various defendants were liable. He does not show a "pattern of similar constitutional violations by untrained employees," and he does not establish how training deficiencies led to the purported violation of his constitutional rights. In

short, he has failed to properly allege that MODOC or the State of Missouri was the "moving force" behind his constitutional deprivation. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (explaining that "a governmental entity is liable under § 1983 only when the entity itself is a moving force behind the deprivation"). Therefore, to the extent that plaintiff is seeking prospective injunctive relief, his official capacity claims against the MODOC employees must be dismissed.

### ii.  Official Capacity Claims Against Corizon Employees

Defendants Gould, Pfister, and Amy Griffith are alleged to be employed by Corizon. As such, plaintiff's official capacity claims against them are actually claims against Corizon itself, a private entity contracted by MODOC to provide healthcare services. "A corporation acting under color of state law cannot be liable on a respondeat superior theory." *Smith v. Insley's Inc.*, 499 F.3d 875, 880 (8th Cir. 2007). Rather, to support a claim against such a corporation, the plaintiff "must show that there was a policy, custom, or official action that inflicted an actionable injury." *Johnson v. Hamilton*, 452 F.3d 967, 973 (8th Cir. 2006). *See also Sanders v. Sears, Roebuck & Co.*, 984 F.2d 972, 975 (8th Cir. 1993) (stating that a corporation acting under color of state law will only be held liable where "there is a policy, custom or action by those who represent official policy that inflicts injury actionable under § 1983").

Here, plaintiff has not presented any allegations regarding a Corizon policy or custom, or any facts indicating action taken by a person representing official Corizon policy. Rather, his factual allegations concern various acts by Corizon employees on a personal basis, and do not establish that any of these acts are attributable to Corizon itself. Further, as noted above, Corizon cannot be liable solely on the basis that they employed the defendants. Therefore, the official capacity claims against the Corizon employees must be dismissed.

20

**B. Claim Against Defendant Johnson**

Plaintiff does indicate the capacity in which he is suing defendant Kristen Johnson, who is alleged to be a caseworker at FCC, and employed by MODOC. A plaintiff can bring a § 1983 claim against a public official acting in his or her official capacity, his or her individual capacity, or both. *Baker v. Chisom*, 501 F.3d 920, 923 (8th Cir. 2007). However, if a plaintiff's complaint is silent about the capacity in which the defendant is being sued, the complaint is interpreted as including only official capacity claims. *Id. See also Johnson*, 172 F.3d at 535 ("[I]n order to sue a public official in his or her individual capacity, a plaintiff must expressly and unambiguously state so in the pleadings, otherwise, it will be assumed that the defendant is sued only in his or her official capacity"); *Artis v. Francis Howell North Band Booster Ass'n, Inc.*, 161 F.3d 1178, 1182 (8th Cir. 1998) ("If the complaint does not specifically name the defendant in his individual capacity, it is presumed he is sued only in his official capacity"); and *Egerdahl v. Hibbing Cmty. Coll.*, 72 F.3d 615, 619 (8th Cir. 1995) ("If a plaintiff's complaint is silent about the capacity in which she is suing the defendant, we interpret the complaint as including only official-capacity claims").

Because plaintiff has not indicated the capacity in which he is suing Johnson, his claim is construed as an official capacity claim. An official capacity claim against an individual is actually a claim against that individual's employer. *See White*, 865 F.3d at 1075. Johnson's employer is MODOC. However, as explained above, plaintiff has failed to state a claim against MODOC. Specifically, to the extent that plaintiff is seeking money damages, the State of Missouri – of which MODOC is a department – is not a § 1983 person. Moreover, to the extent that plaintiff seeks prospective injunctive relief, he has failed to demonstrate that Missouri was the "moving force"

behind the alleged deprivation of his constitutional rights. Therefore, the claim against Johnson must be dismissed.

Even if plaintiff had sued Johnson in an individual capacity, the claim would still be subject to dismissal. Plaintiff states that Johnson was the hearing officer at his first disciplinary hearing, which was held on December 7, 2016. Plaintiff alleges that Johnson violated his right to due process because she did not contact Sergeant Clubbs, who had earlier advised plaintiff he should not be sent to segregation. He also contends that his statement to Johnson, in which he told her that he cannot urinate in front of people, "substantiates that an alternative collection should have occurred."

The determination of whether prison officials denied an inmate due process involves a two-step inquiry. *Williams v. Hobbs*, 662 F.3d 994, 1000 (8th Cir. 2011). First, a plaintiff must demonstrate that he or she was deprived of life, liberty, or property by government action. *Phillips v. Norris*, 320 F.3d 844, 846 (8th Cir. 2003). *See also Beaulieu v. Ludeman*, 690 F.3d 1017, 1047 (8th Cir. 2012) (stating that a court "need reach the question of what process is due only if the inmates establish a constitutionally protected liberty interest"); and *Singleton v. Cecil*, 155 F.3d 983, 987 (8th Cir. 1998) (explaining that to claim a due process violation, plaintiff has to be deprived of either life, liberty, or property, otherwise "it does not matter whether one has received due process or not"). Once it has been established that a liberty interest exists, the process necessary to protect that interest must be determined. *Williams*, 662 F.3d at 1000.

Clearly, life or property is not at issue here. As to establishing a liberty interest, the United States Supreme Court has determined that prisoners have a protected liberty interest in avoiding conditions of confinement that impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995).

In this case, plaintiff has alleged no facts showing that he has been deprived of a constitutionally protected liberty interest. In other words, there is no indication that an "atypical and significant hardship" has been imposed upon him. Even if the Court assumes that Johnson sent plaintiff to administrative segregation following the hearing, placement in administrative segregation alone is not sufficient. That is, "an inmate must show that the segregation created an atypical and significant hardship on him in relation to the ordinary incidents of prison life to demonstrate that his liberty interest was curtailed." *Rahman X v. Morgan*, 300 F.3d 970, 973 (8th Cir. 2002). Plaintiff's minimal facts fail to accomplish this. For example, he has not shown how long he was in segregation, or whether other rights or privileges were curtailed by placement in segregation.

Furthermore, even if plaintiff had established a liberty interest, he has not shown that the hearing he received was violative of due process. As to what process is due, the "fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). When an inmate is deprived of privileges or placed in special confinement status as punishment for past misconduct, due process requires a hearing beforehand. *Brown-El v. Delo*, 969 F.2d 644, 647 (8th Cir. 1992). Nevertheless, "[p]rison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply." *Gonzalez-Perez v. Harper*, 241 F.3d 633, 637 (8th Cir. 2001). To that end, due process requirements include written notice of the charge; a written statement by the factfinders as to the evidence relied on and the reasons for the disciplinary action; the right of the inmate to be present, call witnesses, and present documentary evidence; and, in limited situations, a counsel substitute. *See Wolff v. McDonnell*, 418 U.S. 539, 564-70 (1974).

23

Plaintiff provides no support for the proposition that the December 7, 2016 hearing denied him "the opportunity to be heard at a meaningful time and in a meaningful manner." Rather, as his accusations make clear, he is less concerned about the process than the outcome. In particular, he insists that Johnson should have contacted Sergeant Clubbs about the supposed conversation plaintiff had with Clubbs prior to his hearing. Johnson's refusal to do this is not a constitutional violation. "Prison disciplinary proceedings take place in a highly charged atmosphere, and prison administrators must often act swiftly on the basis of evidence that might be insufficient in less exigent circumstances." *Spence v. Farrier*, 807 F.2d 753, 756 (8th Cir. 1986). As such, due process is satisfied as long as "some evidence supports the decision by the prison disciplinary board." *Id*. In this case, there was clearly "some evidence" to support Johnson's decision. Specifically, plaintiff admits that he pleaded guilty to the violation at the time of the interview, the night when the attempted collection occurred. Therefore, even if plaintiff had sued Johnson in her individual capacity, his claim against her would be subject to dismissal.

### C.  Individual Capacity Claims

Plaintiff has sued defendants Precythe, Lawson, Bowyer, Ezersky, Hinkle, Pickett, Sergeant Griffith, Lombardi, Gould, Pfister, Amy Griffith, Boyd, Engers, Edmonds, Killian, White, and O'Kelley in their individual capacities. The Court will look at the claims against each defendant in turn.

#### i.    Director Precythe

Plaintiff claims that Director Precythe, acting in her individual capacity, failed to respond to or investigate complaints he sent to her. He does not add any further facts to support this allegation, or to establish that Precythe's actions resulted in plaintiff's constitutional rights being violated. Precythe's position as director of MODOC is not sufficient, in and of itself, to establish

liability. *See Camberos v. Branstad*, 73 F.3d 174, 176 (8ᵗʰ Cir. 1995) (stating that "a general responsibility for supervising the operations of a prison is insufficient to establish the personal involvement required to support liability"). Moreover, the Court finds that plaintiff has presented only a bare conclusion against Precythe, which is insufficient to state a claim. *See Wiles v. Capitol Indem. Corp.*, 280 F.3d 868, 870 (8ᵗʰ Cir. 2002) ("While the court must accept allegations of fact as true…the court is free to ignore legal conclusions, unsupported conclusions, unwarranted inferences and sweeping legal conclusions cast in the form of factual allegations"). Therefore, the individual capacity claim against Precythe must be dismissed.

### ii.     Warden Lawson

Plaintiff alleges that Warden Lawson, acting in an individual capacity,[4] was deliberately indifferent to plaintiff's "disability and mental health need[s] by knowingly and unintelligently allowing" him to be punished for failing to produce a urine specimen. Plaintiff further claims that Lawson failed to train her employees in the proper procedure of disciplinary hearings, and in the proper drug testing procedures.

Vicarious liability is inapplicable to § 1983 suits. *Marsh*, 902 F.3d at 754. As such, "[g]overnment officials are personally liable only for their own misconduct." *S.M. v. Krigbaum*, 808 F.3d 335, 340 (8ᵗʰ Cir. 2015). However, plaintiff's allegations that Lawson allowed him to be punished, and that plaintiff wrote to Lawson about his condition, do not demonstrate Lawson's personal responsibility for any wrongdoing. To the contrary, plaintiff acknowledges that when Lawson reviewed his grievance concerning two of his conduct violations, Lawson determined that

---

[4] The Court notes that on the portion of the form complaint to list defendants, plaintiff indicated an intention to sue Warden Lawson in both an individual and official capacity. (Docket No. 7 at 6). However, in the actual Statement of Claim, plaintiff states that he is only suing Lawson in an official capacity. (Docket No. 7 at 9-10). Nevertheless, the Court will treat plaintiff's claims against Lawson as including an individual capacity claim.

he had a valid medical lay-in. Accordingly, plaintiff's violations were dismissed. (Docket No. 7-1 at 16). Thus, this assertion fails to state an individual capacity claim and must be dismissed.

Plaintiff's allegation regarding Lawson's failure to train her employees is also insufficient to state a claim. In order to demonstrate a failure to train, plaintiff must present facts showing that Lawson "(1) received notice of a pattern of unconstitutional acts committed by a subordinate, and (2) was deliberately indifferent to or authorized those acts." *See Rogers v. King*, 885 F.3d 1118, 1122 (8th Cir. 2018). Plaintiff's conclusory pleading does not support either of these elements of a cause of action. Moreover, plaintiff provides no factual support for the proposition that a failure to train actually caused him injury. *See Moore v. City of Desloge, Mo.*, 647 F.3d 841, 849 (8th Cir. 2011) (stating that in order to maintain an action for training or supervisory liability, the plaintiff must show that the failure to train or supervise caused the injury). Therefore, this claim must be dismissed.

### iii.    Assistant Warden Bowyer

Plaintiff alleges that Assistant Warden Bowyer, acting in his individual capacity, upheld sanctions imposed due to a medical condition, allowing cruel and unusual punishment to occur. Plaintiff also states that Bowyer failed to protect him from First Amendment retaliation after he provided Bowyer with "evidence of retaliation for filing grievances." Furthermore, plaintiff asserts that Bowyer signed off on an IRR that had been answered by Clinical Director Griffith, who plaintiff states is a "compromised conspirator."

Plaintiff's allegations regarding Bowyer upholding sanctions and failing to protect him from retaliation are entirely conclusory. There are no facts establishing what role Bowyer actually played in the disciplinary process, thereby showing Bowyer's personal responsibility. Furthermore, plaintiff does not present any facts demonstrating that he was being retaliated against,

much less that Bowyer failed to protect him. "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Neubauer v. FedEx Corp.*, 849 F.3d 400, 404 (8th Cir. 2017). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id*. Here, plaintiff's assertions against Bowyer amount to nothing more than labels and conclusions, without any factual enhancement. Thus, he has failed to adequately state a claim, and the claim must be dismissed.

Plaintiff's allegation regarding Bowyer signing off on an IRR also fails. A prison grievance procedure is a procedural right only and does not confer upon an inmate a substantive right. *Buckley v. Barlow*, 997 F.2d 494, 495 (8th Cir. 1993). *See also Lomholt v. Holder*, 287 F.3d 683, 684 (8th Cir. 2002) (agreeing with district court that "defendants' denial of [plaintiff's] grievances did not state a substantive constitutional claim"); and *Fallon v. Coulson*, 5 F.3d 531, 1993 WL 349355, at *1 (8th Cir. 1993) (unpublished opinion) (stating that the failure of defendants "to acknowledge receipt of and respond to plaintiffs' grievances pursuant to prison procedure did not violate any of plaintiffs' constitutional rights"). As such, any action that Bowyer took as part of FCC's grievance procedure is not cognizable under 42 U.S.C. § 1983. Therefore, this claim must be dismissed.

### iv.   Sergeant Ezersky

Plaintiff alleges that Sergeant Ezersky, in his individual capacity, violated his constitutional rights by having him attempt to provide an observed urine sample, and then issuing him a conduct violation when plaintiff was unable to urinate.

The state-compelled collection and testing of urine constitutes a search subject to the protections of the Fourth Amendment. *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 652 (1995). The Fourth Amendment extends to prison inmates, and prohibits "unreasonable searches of their

bodies." *Levine v. Roebuck*, 550 F.3d 684, 687 (8th Cir. 2008). However, prison inmates have a lower expectation of privacy than other individuals in society. *Goff v. Nix*, 803 F.2d 358, 365 (8th Cir. 1986). As such, prisons are allowed to randomly collect and analyze urine samples from inmates. *See Spence*, 807 F.2d at 755; and *Levine*, 550 F.3d at 687 (explaining "that random urinalysis testing of inmates did not violate the Fourth Amendment because the prison system's security interest in detecting the unauthorized use of narcotics, and the inmates' diminished expectations of privacy, justified a truly random procedure for selecting the inmates to be tested"). Such a search, though, must be conducted in a reasonable manner. *Spence*, 807 F.2d at 755.

Though plaintiff claims that his Eighth Amendment rights were violated, it appears that he is actually attempting to allege that his observed test constituted an unreasonable search. However, plaintiff's facts do not establish that Sergeant Ezersky acted in an unreasonable manner. Plaintiff states that the attempted collection took place in a bathroom in the medical unit. There is no indication that Sergeant Ezersky was of a different gender than plaintiff, or that plaintiff was inappropriately chosen to give a specimen. Plaintiff states that the restroom was in "plain view" of quarantined offenders, and that female staff members were "in the immediate area," but he does not allege that anyone – particularly any females – actually observed him. While plaintiff contends that Sergeant Ezersky violated Policy D5-7.1, he does not provide any specifics in support of his conclusion. In short, to the extent that plaintiff is alleging that Sergeant Ezersky violated his constitutional rights by having him attempt to give an observed urine sample, he has failed to state a claim. Therefore, this claim must be dismissed.

Plaintiff's assertion that Sergeant Ezersky violated his rights by giving him a conduct violation also fails to state a claim. Plaintiff apparently believes that Sergeant Ezersky should not have given him the violation because of his paruresis. However, his own facts demonstrate that

Sergeant Ezersky had a document showing that his medical lay-in had expired. Beyond plaintiff's bare conclusion, there is nothing further to support the suggestion that Sergeant Ezersky's issuance of a conduct violation was violative of his constitutional rights. *See Glick v. Sargent*, 696 F.2d 413, 414 (8th Cir. 1983) (agreeing with district court that inmate had failed to state a claim against a correctional officer who had initiated a disciplinary action against him that later resulted in the inmate being found guilty). As such, this claim must be dismissed.

v.    **FUM Hinkle**

Plaintiff alleges that FUM Hinkle, acting in her individual capacity, inflicted cruel and unusual punishment on him, and also violated his right to due process. Specifically, he explains that in October 2017, plaintiff went to Hinkle's office and told her about his fear of being terminated from MOSOP due to paruresis and his "inability to provide a urine sample in the presence of others." Plaintiff attempted to present "documentation on the disease," but Hinkle declined, stating that if plaintiff had any issues, she would dismiss the resulting violations. Thereafter, in January 2018, plaintiff received conduct violations, which he presented to Hinkle. Hinkle, however, declined to dismiss the violations. Neither of these allegations present a constitutional violation.

As to the Eighth Amendment, plaintiff's violations do not support the contention that FUM Hinkle unnecessarily and wantonly inflicted pain upon plaintiff, or that Hinkle deprived plaintiff of the basic necessities of human life. *See Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992) (stating that the "Cruel and Unusual Punishments Clause" is violated when force is applied "maliciously and sadistically to cause harm"); *Revels v. Vincenz*, 382 F.3d 870, 875 (8th Cir. 2004) (stating that to allege an Eighth Amendment violation, a prisoner must show that the defendant's conduct rose to the level of a constitutional violation "by depriving the plaintiff of the minimal civilized measure

29

of life's necessities"); and *Simmons v. Cook*, 154 F.3d 805, 807 (8th Cir. 1998 (stating that prison officials are required to "ensure that inmates receive adequate food, clothing, shelter, and medical care"). Hinkle's refusal to dismiss a conduct violation does not constitute force, and does not constitute the deprivation of basic necessities. Therefore, plaintiff's cruel and unusual punishment claim under the Eighth Amendment must be dismissed.

With regard to the Fourteenth Amendment, plaintiff's due process claim also fails. In order to demonstrate a due process violation, plaintiff must first show that he "was deprived of life, liberty, or property." *See Phillips*, 320 F.3d  at 846. As life or property is not at issue here, plaintiff must identify a liberty interest. In this case, plaintiff contends only that Hinkle did not fulfill an earlier promise to dismiss any conduct violation he might receive due to his inability to provide a urine specimen. There is no indication that Hinkle had the authority to take such action outside the usual disciplinary process. Even if she did, there is no support for the contention that a broken promise amounts to the deprivation of a liberty interest. Because there is no constitutionally protected interest at stake, it does not matter what process is due. *See Beaulieu*, 690 F.3d at 1047. Therefore, plaintiff's due process claim under the Fourteenth Amendment must be dismissed.

### vi.     Caseworker Pickett

Plaintiff alleges that Caseworker Pickett, acting in an individual capacity, violated his right to due process by withholding evidence during a disciplinary hearing. In particular, plaintiff claims that Pickett "refused to provide [him] an alleged statement by a Doctor." He further states that "[w]ithout knowledge of a statement there exist[s] no opportunity for redress."

Plaintiff's conclusory assertions against Caseworker Pickett fail to state a claim, as he provides no factual support for his contentions. For example, plaintiff does not describe the nature of the evidence purportedly withheld, the contents of the doctor's statement that Pickett was

supposed to provide, or even allege that Pickett was responsible for providing plaintiff with evidence for his hearing. Plaintiff's reliance on labels, conclusions, and the recitation of the elements of a cause of action are not sufficient to state a claim. *See Hamilton v. Palm*, 621 F.3d 816, 817-18 (8ᵗʰ Cir. 2010) (explaining that to state a cause of action, "[a] pleading that merely pleads labels and conclusions, or a formulaic recitation of the elements of a cause of action, or naked assertions devoid of factual enhancement will not suffice").

Furthermore, plaintiff has not properly presented a due process claim. Earlier, the Court noted that the determination of whether prison officials denied an inmate due process involves a two-step inquiry. *See Williams*, 662 F.3d at 1000. Plaintiff must first show the existence of a constitutionally protected liberty interest, before the Court is required to reach the question of what process is due. *See Beaulieu*, 690 F.3d at 1047. Here, plaintiff has not identified a liberty interest. That is, he has not alleged that he was subjected to an "atypical and significant hardship…in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484. Without a liberty interest at stake, the Court is not required to examine whether the process afforded plaintiff was adequate. For this reason as well, plaintiff has failed to state a claim. Therefore, his claims against Pickett must be dismissed.

### vii.    Sergeant Griffith

Plaintiff alleges that Sergeant Griffith, acting in an individual capacity as the urinalysis coordinator, failed to train his subordinates in conducting urine specimen collection in a manner "consistent with established policy D5-7.1." He further claims that Sergeant Griffith failed to accommodate his disability, resulting in cruel and unusual punishment. (Docket No. 7 at 27).

Plaintiff's claims against Sergeant Griffith are composed entirely of legal conclusions. He recites various causes of action, such as a failure to train and a failure to accommodate, but

provides no factual support to show what Sergeant Griffith actually did or did not do. "A pleading must offer more than labels and conclusions or a formulaic recitation of the elements of a cause of action to state a plausible claim for relief." *Johnson v. Precythe*, 901 F.3d 973, 977 (8th Cir. 2018). Here, the accusations against Sergeant Griffith do not state a plausible claim for relief. Therefore, the claims against Sergeant Griffith must be dismissed.

### viii.    Ex-Director Lombardi

Plaintiff alleges that Ex-MODOC Director Lombardi, acting in his individual capacity, was deliberately indifferent to his mental health needs and failed to "provide auxiliary aids for [his] disability," even though plaintiff wrote him "multiple times."

Liability in a § 1983 case is personal. *Frederick v. Motsinger*, 873 F.3d 641, 646 (8th Cir. 2017). That is, "[g]overnment officials are personally liable only for their own misconduct." *S.M.*, 808 F.3d at 340. As such, § 1983 liability "requires a causal link to, and direct responsibility for, the deprivation of rights." *Madewell v. Roberts*, 909 F.2d 1203, 1208 (8th Cir. 1990). *See also Kohl v. Casson*, 5 F.3d 1141, 1149 (8th Cir. 1993) (dismissing plaintiff's excessive bail claims because none of the defendants set plaintiff's bail, and therefore, "there can be no causal connection between any action on the part of the defendants and any alleged deprivation" of plaintiff's rights). To that end, a plaintiff must allege facts connecting the defendant to the challenged action. *See Bitzan v. Bartruff*, 916 F.3d 716, 717 (8th Cir. 2019).

Here, plaintiff's deliberate indifference claim lacks factual support. For example, plaintiff does not describe what "auxiliary aids" Lombardi failed to provide, does not give the timeframe in which this took place, and most importantly, does not show how Lombardi's alleged failure violated his constitutional rights. In short, he has not provided any facts that connect Lombardi to a constitutional violation. Therefore, plaintiff's claim against Lombardi must be dismissed.

ix.     **Assistant Clinical Director Gould**

Plaintiff alleges that Assistant Clinical Director Gould, acting in her individual capacity, retaliated against him for filing grievances in violation of the First Amendment. He also claims that Gould violated his right to due process based on her role in two disciplinary hearings. Finally, plaintiff asserts that Gould violated his Eighth Amendment and due process rights by "knowingly, willfully, and maliciously providing materially and factually false statements to Scott O'Kelley." None of these allegations state a claim.

a.  **First Amendment Retaliation**

Plaintiff has failed to adequately state a claim for First Amendment retaliation. As a general matter, the First Amendment prohibits government officials from retaliating against an individual for speaking out. *See Hartman v. Moore*, 547 U.S. 250, 256 (2006). In order to prevail on a First Amendment retaliation claim, a plaintiff "must show that [he] engaged in protected activity, that the [defendant's] actions caused an injury to the [plaintiff] that would chill a person of ordinary firmness from continuing to engage in the activity, and that a causal connection exists between the retaliatory animus and the injury." *Small v. McChrystal*, 708 F.3d 997, 1008 (8th Cir. 2013).

Retaliation does not need to be the "sole motive" in taking an action against the plaintiff, must it must have been a "substantial factor" in the decision. *Kilpatrick v. King*, 499 F.3d 759, 767 (8th Cir. 2007). Furthermore, the plaintiff must demonstrate that the retaliatory motive was a "but-for" cause of the action. *Baribeau v. City of Minneapolis*, 596 F.3d 465, 481 (8th Cir. 2010). *See also Osborne v. Grussing*, 477 F.3d 1002, 1006 (8th Cir. 2007) (explaining that "[i]f there is a finding that retaliation was not the but-for cause…the claim fails for lack of causal connection between unconstitutional motive and resulting harm, despite proof of some retaliatory animus in the official's mind"). That is, plaintiff must show that he was "singled out" because of his exercise

of constitutional rights. *Baribeau*, 596 F.3d at 481. *See also Bernini v. City of St. Paul*, 665 F.3d 997, 1007 (8th Cir. 2012) (stating that to establish a causal connection, the plaintiff must show that he was "singled out" because of his exercise of constitutional rights).

In this case, plaintiff asserts that he was retaliated against because of his filing of grievances. The right to be free from retaliation for availing oneself of the grievance process is clearly established in the Eighth Circuit. *Santiago v. Blair*, 707 F.3d 984, 991 (8th Cir. 2013). *See also Nelson v. Shuffman*, 603 F.3d 439, 450 (8th Cir. 2010) (stating "that actions taken in retaliation for an inmate's filing of a grievance are actionable under 42 U.S.C. § 1983"). Thus, plaintiff has adequately alleged that he engaged in a protected activity.

Plaintiff has not, however, demonstrated that a retaliatory motive was the "but-for cause" of any adverse action taken against him. For instance, plaintiff states that in May 2018, Gould berated, chastised, and shamed him. Aside from saying this event occurred "after" plaintiff had contacted Scott O'Kelley, he provides no facts showing that Gould had an unconstitutional motive, or that there was some causal connection between that motive and the resulting harm. *See Osborne*, 477 F.3d at 1006. Similarly, plaintiff claims that when he returned to MOSOP after his first termination, he was advised by a therapist that he was to be treated as if he had never been in the program. He implies that Gould made this decision. Nevertheless, there are absolutely no facts to support the contention that this treatment decision was made with retaliatory animus.

On August 2, 2018, plaintiff states that there was a "special process group" to discuss plaintiff's letters to O'Kelley. Plaintiff "felt" this was done in an attempt to isolate him from the group. However, as his allegations demonstrate, the purpose of the group was to discuss how his letters to O'Kelley were interfering with his treatment. Thus, even assuming that the holding of

34

this group was an adverse action, plaintiff has not shown that retaliation was the but-for cause of the resulting harm. *See Baribeau*, 596 F.3d at 481.

On December 19, 2018, plaintiff claims that he received a treatment team referral for a program review. He states that his "pattern of filing grievances or family grievances" was listed as a reason. Based on the information provided by plaintiff, it is clear that grievances were listed on the referral because plaintiff's complaints, as well as the complaints of his family, showed that plaintiff was not taking responsibility for his actions, as required by MOSOP. Moreover, as plaintiff himself acknowledges, there other reasons listed on the referral. Thus, as above, plaintiff's facts do not demonstrate a causal connection between the alleged retaliatory animus and his injury. *See Small*, 708 F.3d at 1008.

Finally, on February 20, 2019, plaintiff received a second treatment team referral, which eventually resulted in his termination from MOSOP. According to plaintiff, this referral came a day after his mother contacted O'Kelley to see what was going on. Other than the fact that this referral came a day after his mother's attempt to reach out, plaintiff provides no facts to support the proposition that this second referral was made with retaliatory animus. Indeed, plaintiff does not even provide any facts showing that Gould generated the referral. Furthermore, as plaintiff acknowledges, there were a number of non-grievance-related reasons for this second referral, specifically with regard to plaintiff's completion of an "offense chain." In particular, the classification hearing report attached to plaintiff's amended complaint explains that plaintiff was terminated from MOSOP on the basis of his failure to take accountability in his offense chain, his lack of engagement in treatment, and his tendency to focus blame on others. (Docket No. 7-1 at 18). Plaintiff goes to great lengths to explain his attempts to complete the "offense chain," but entirely fails to establish that retaliation was the but-for cause of the referral, or that he was singled

out for exercising his constitutional rights. *See Bernini*, 665 F.3d at 1007  (stating that to establish a causal connection, the plaintiff must show that he was "singled out" because of his exercise of constitutional rights).

 As noted above, plaintiff must demonstrate that a retaliatory motive was a "but-for" cause of the action taken against him. *See Baribeau*, 596 F.3d at 481. However, plaintiff's allegations fail to demonstrate that a causal connection exists between Gould's allegedly retaliatory animus and his injury. Therefore, the First Amendment retaliation claim against Gould must be dismissed.

### b.  Due Process

Plaintiff has also failed to state a due process claim against Gould. As previously discussed, the determination of whether prison officials denied an inmate due process involves a two-step inquiry. *Williams*, 662 F.3d at 1000. First, a plaintiff must demonstrate that he or she was deprived of life, liberty, or property by government action. *Phillips*, 320 F.3d at 846. *See also Beaulieu*, 690 F.3d at 1047 (stating that a court "need reach the question of what process is due only if the inmates establish a constitutionally protected liberty interest"); and *Singleton*, 155 F.3d at 987 (explaining that to claim a due process violation, plaintiff has to be deprived of either life, liberty, or property, otherwise "it does not matter whether one has received due process or not"). Once it has been established that a liberty interest exists, the process necessary to protect that interest must be determined. *Williams*, 662 F.3d at 1000.

Because life or property is not at issue in this case, plaintiff must first show that he had a protected liberty interest to sustain his due process claim. Here, plaintiff asserts that Gould failed to provide statements of evidence, failed to provide an impartial committee, and withheld exculpatory evidence. Besides being conclusory, these statements do not establish that plaintiff had a protected liberty interest. There is no indication, for instance, that plaintiff was subjected to

36

Case: 4:19-cv-00392-JAR   Doc. #:  11   Filed: 05/11/20   Page: 37 of 51 PageID #: 200

an "atypical and significant hardship…in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484. Moreover, while plaintiff notes that as a result of the treatment team referrals, and the subsequent hearings, he was terminated from MOSOP, the United States Court of Appeals for the Eighth Circuit has previously determined that an inmate does not have a liberty interest in participating in MOSOP. *See Jones v. Moore*, 996 F.2d 943, 946 (8th Cir. 1993) (holding that an inmate "did not have a liberty interest in participating in MOSOP at the time he desired to do so"). *See also Persechini v. Callaway*, 651 F.3d 802, 808 (8th Cir. 2011) (stating that plaintiff "did not have a protected liberty interest in the discretionary probationary release to which he would have become eligible had he successfully completed" MODOC's long-term substance abuse treatment program). Finally, to the extent that plaintiff complains that he missed an earlier parole date due to his inability to complete MOSOP, it is worth noting that plaintiff does not have a protected liberty interest in the possibility of parole. *Adams v. Agniel*, 405 F.3d 643, 645 (8th Cir. 2005). Because plaintiff has not identified a protected liberty interest, the Court need not determine whether the process necessary to protect that interest was sufficient. Therefore, the due process claims against Gould must be dismissed.

### c.   False Statements

Also included among plaintiff's claims against Gould is the contention that Gould "knowingly, willfully, and maliciously" provided "materially and factually false statements to Scott O'Kelley." Apparently, this is in reference to answers provided by Gould to a series of questions posed by O'Kelley. (Docket No. 7-1 at 9-12). This allegation is wholly conclusory and fails to state a claim. *See Brown*, 820 F.3d at 372-73 (stating that court must accept factual allegations in complaint as true, but is not required to "accept as true any legal conclusion couched as a factual allegation"). Therefore, this claim against Gould must be dismissed.

37

### x.      Manger of MOSOP Operations Pfister

Plaintiff alleges that Manager of MOSOP Operations Pfister, acting in his individual capacity, retaliated against him in violation of the First Amendment. He also states that Pfister violated his right to due process.

With regard to the retaliation claim, plaintiff has failed to establish that Pfister took "adverse action" against him. *See Revels*, 382 F.3d at 876 (stating that a First Amendment retaliation claim must include allegations that plaintiff engaged in protected activity and that defendant, to retaliate for the protected activity, took adverse action against plaintiff that would chill a person of ordinary firmness from engaging in that activity). Specifically, plaintiff states that in June 2018, Pfister summoned him to a room, stood over him, and told him that his grievance had made it to Jefferson City and was being investigated. Nothing in those facts indicate that an adverse action was taken. That is, Pfister did not punish or threaten plaintiff in any way. Later, in August 2018, plaintiff asserts that Pfister threatened him "with termination and disciplinary segregation." However, as plaintiff makes clear, this was not in response to plaintiff's filing of grievances, but because plaintiff had showed another inmate information that Scott O'Kelley had provided him. Because plaintiff has not shown that Pfister took adverse action against him, he has failed to state a retaliation claim. Therefore, the First Amendment retaliation claim against Pfister must be dismissed.

The due process claims against Pfister also fails. Plaintiff asserts that Pfister did not provide an impartial panel for his treatment team hearings, did not provide exculpatory evidence, and denied him access to his treatment file, therapist notes, and sign-in sheets. However, before reaching the question of what process is due, and whether that process was violated, plaintiff must show that he had a protected liberty interest. *See Beaulieu*, 690 F.3d at 1047 (stating that a court

38

"need reach the question of what process is due only if the inmates establish a constitutionally protected liberty interest"); and *Singleton*, 155 F.3d at 987 (explaining that to claim a due process violation, plaintiff has to be deprived of either life, liberty, or property, otherwise "it does not matter whether one has received due process or not").

Here, plaintiff has not shown an "atypical and significant hardship…in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484. Moreover, plaintiff does not have a liberty interest in participating in MOSOP. *See Jones*, 996 F.2d at 946 (holding that inmate "did not have a liberty interest in participating in MOSOP at the time he desired to do so"). *See also Persechini*, 651 F.3d at 808 (stating that plaintiff "did not have a protected liberty interest in the discretionary probationary release to which he would have become eligible had he successfully completed" MODOC's long-term substance abuse treatment program); and *Adams*, 405 F.3d at 645 (stating that an inmate does not have a protected liberty interest in the possibility of parole). As no liberty interest was at stake, the Court does not reach the question of what process was due. Therefore, the due process claims against Pfister must be dismissed.

Finally, plaintiff's allegation that Pfister responded to IRRs in which he was accused of wrongdoing and constitutional violations is not actionable. That is, a prison grievance procedure is a procedural right only and does not confer upon an inmate a substantive right. *Buckley*, 997 F.2d at 495. *See also Lomholt*, 287 F.3d at 684 (agreeing with district court that "defendants' denial of [plaintiff's] grievances did not state a substantive constitutional claim"); and *Fallon*, 5 F.3d 531, 1993 WL 349355, at *1 (unpublished opinion) (stating that the failure of defendants "to acknowledge receipt of and respond to plaintiffs' grievances pursuant to prison procedure did not violate any of plaintiffs' constitutional rights"). As such, Pfister's actions relating to FCC's

grievance procedure are not cognizable under 42 U.S.C. § 1983. Therefore, this claim must be dismissed.

### xi.    Clinical Director Griffith

Plaintiff alleges that Clinical Director Griffith, acting in her individual capacity, "responded to an I.R.R. written on her direct subordinate." Later, Clinical Director Griffith failed to provide him a grievance form. In a written report regarding the IRR hearing, plaintiff states that Clinical Director Griffith "made materially false statements in an attempt to cover up or justify Gould and Pfister['s] termination" of him from MOSOP. Plaintiff contends that the hearing was a farce, and the response predetermined.

The allegations regarding Clinical Director Griffith's role in the grievance process does not state a constitutional violation. *See Buckley*, 997 F.2d at 495. *See also Lomholt*, 287 F.3d at 684 (agreeing with district court that "defendants' denial of [plaintiff's] grievances did not state a substantive constitutional claim"); and *Fallon*, 5 F.3d 531, 1993 WL 349355, at *1 (unpublished opinion) (stating that the failure of defendants "to acknowledge receipt of and respond to plaintiffs' grievances pursuant to prison procedure did not violate any of plaintiffs' constitutional rights"). Meanwhile, the allegations regarding the IRR hearing must fail because plaintiff has not identified a liberty interest. *See Beaulieu*, 690 F.3d at 1047 (stating that a court "need reach the question of what process is due only if the inmates establish a constitutionally protected liberty interest"). To be more precise, plaintiff's assertion that he was wrongfully terminated from MOSOP – and that Clinical Director Griffith was trying to justify that decision – does not implicate a liberty interest, because plaintiff has no such interest in participating in MOSOP. *See Jones*, 996 F.2d at 946.

Plaintiff also accuses Clinical Director Griffith of conspiring with Gould and Pfister "to manufacture false claims to substantiate [his] termination from M.O.S.O.P," resulting in the loss

of his "time credit date." This allegation is presented in the form of a conclusion, without any supporting facts. As such, it does not state a plausible claim for relief. *See Johnson*, 901 F.3d at 977 (stating that "[a] pleading must offer more than labels and conclusions or a formulaic recitation of the elements of a cause of action to state a plausible claim for relief"). Therefore, this claim against Clinical Director Griffith must be dismissed.

### xii.   Therapist Boyd

Plaintiff alleges that Therapist Boyd, acting in her individual capacity, was deliberately indifferent to his mental health needs. In particular, he asserts that he informed Boyd about his paruresis, and his fear of being terminated from MOSOP, on October 10, 2017, but that Boyd declined his offer to provide her information on his condition. Instead, she advised plaintiff that they "would deal with the issue when it occurred." Plaintiff also states that Boyd allowed him to be cruelly and unusually punished in violation of the Eighth Amendment. Plaintiff further accuses Boyd of conspiring with Gould to have him restart MOSOP from the beginning after he returned in March 2018.

Under the Eighth Amendment, the government has an obligation to provide medical care to those whom it is punishing by incarceration. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). To demonstrate constitutionally inadequate medical care, the inmate must show that a prison official's conduct amounted to deliberate indifference. *Dulany v. Carnahan*, 132 F.3d 1234, 1237-38 (8th Cir. 1997).

In order to establish deliberate indifference, a plaintiff must prove that he suffered from an objectively serious medical need, and that prison officials actually knew of and disregarded that need. *Roberts v. Kopel*, 917 F.3d 1039, 1042 (8th Cir. 2019). *See also Hamner v. Burls*, 937 F.3d 1171, 1177 (8th Cir. 2019). "A serious medical need is one that has been diagnosed by a physician

41

as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997). Deliberate indifference can include the intentional denial or delay of access to medical care, or the intentional interference with treatment or prescribed medication. *Vaughn v. Lacey*, 49 F.3d 1344, 1346 (8th Cir. 1995). The principle of deliberate indifference extends to an inmate's mental health needs. *Smith v. Jenkins*, 919 F.2d 90, 92-93 (8th Cir. 1990).

To prevail under the deliberate indifference standard, an inmate must demonstrate that a prison health care provider's actions were "so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care." *Jackson v. Buckman*, 756 F.3d 1060, 1066 (8th Cir. 2014). As such, "deliberate indifference requires a highly culpable state of mind approaching actual intent." *Kulkay v. Roy*, 847 F.3d 637, 643 (8th Cir. 2017).

Here, the entirety of plaintiff's deliberate indifference claim consists of his assertion that Boyd refused plaintiff's offer to provide information on his paruresis, after plaintiff raised his fear that he might be terminated from MOSOP due to his inability to provide a urine sample. This is insufficient to state a deliberate indifference claim. Specifically, there is no indication that Boyd denied or delayed plaintiff's access to medical or mental health care, or otherwise interfered with his treatment. Clearly, plaintiff was attempting to preemptively insulate himself from the potential consequences of being unable to provide a urine sample; however, this in no way implicates plaintiff's access to or receipt of mental health treatment.

Plaintiff's assertion that Boyd allowed him to be cruelly and unusually punished is similarly meritless. That is, there are no facts demonstrating that Boyd's refusal to view plaintiff's paruresis information caused plaintiff to be unconstitutionally punished. *See Madewell*, 909 F.2d at 1208 (stating that § 1983 liability "requires a causal link to, and direct responsibility for, the

42

deprivation of rights"). Certainly, the refusal to accept plaintiff's "information," whatever that information consisted of, does not itself constitute cruel and unusual punishment.

Finally, plaintiff's accusation that Boyd "conspired" with Assistant Clinical Director Gould to have plaintiff restart the MOSOP program from the beginning is nothing more than an unsupported conclusion. There are no facts showing a meeting of the minds between Boyd and Gould. Moreover, plaintiff has not demonstrated that his having to restart the MOSOP program was itself a constitutional violation. Therefore, plaintiff's claims against Boyd must be dismissed.

### xiii.    Therapist Engers

Plaintiff alleges that Therapist Engers, acting in an individual capacity, conspired with Gould to retaliate against plaintiff for filing grievances. He states that "Engers made multiple comments in groups about grievances," "misrepresented material facts" on the two treatment team referrals," and "listed grievances on a referral." As such, plaintiff asserts that Engers retaliated against him in violation of his rights under the First Amendment.

In order to state a First Amendment retaliation claim, plaintiff must include factual allegations that he engaged in protected activity and that the defendant, to retaliate for the protected activity, took adverse action against him that would chill a person of ordinary firmness from engaging in that activity. *See Revels*, 382 F.3d at 876. The filing of a grievance is a protected activity. *See Santiago*, 707 F.3d at 991 (stating that the right to be free from retaliation for availing oneself of the grievance process is clearly established); and *Nelson*, 603 F.3d at 450 (stating "that actions taken in retaliation for an inmate's filing of a grievance are actionable under 42 U.S.C. § 1983").

In this case, plaintiff has alleged that he has engaged in the filing of grievances, which is an activity protected by the First Amendment. However, his allegations against Engers wholly fail

to show that Engers personally took any adverse action against him. Specifically, plaintiff's assertion that Engers "conspired with Gould to retaliate against" him is a legal conclusion, lacking any facts showing a meeting of the minds between Engers and Gould, or any indication of what plaintiff meant by "retaliate." Similarly, plaintiff states that Engers made "multiple comments" without explaining what those comments entailed; he states that Engers "misrepresented material facts," without providing any details or substance about those facts; and he states that Engers "listed grievances on a referral," with no attempt made to show how this constitutes adverse action. In short, plaintiff has presented the elements of a cause of action, without any factual enhancement to support the label he has proposed. *See Neubauer*, 849 F.3d at 404 (stating that "[a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do"). Therefore, plaintiff's claim against Engers must be dismissed.

### xiv.    Caseworker Edmonds

Plaintiff alleges that Caseworker Edmonds, acting in an individual capacity, failed to provide a fair and impartial panel at his treatment team hearing, failed to protect him from "blatant retaliation," and failed to take "corrective action" when plaintiff explained to Edmonds what he was going through. As previously noted, to state a § 1983 claim, plaintiff must allege facts that connect the defendant to the challenged action. *See Bitzan*, 916 F.3d at 717. He must also factually demonstrate a defendant's direct responsibility for the deprivation of his rights. *See Madewell*, 909 F.2d at 1208 (stating that § 1983 liability "requires a causal link to, and direct responsibility for, the deprivation of rights"). Here, instead of presenting any such facts, plaintiff merely lists a series of conclusory "failures" that he attributes to Edmonds. Plaintiff's conclusory assertions are not entitled to the presumption of truth. *Torti v. Hoag*, 868 F.3d 666, 671 (8th Cir. 2017) ("Courts are not bound to accept as true a legal conclusion couched as a factual allegation, and factual

44

allegations must be enough to raise a right to relief above the speculative level"). Therefore, the claims against Edmonds must be dismissed.

xv.    **Caseworker Killian**

Plaintiff alleges that Caseworker Killian, acting in his individual capacity, refused to speak with him about the purported retaliation he was experiencing. He asserts this demonstrated Killian's deliberate indifference to the violation of his First Amendment rights, and resulted in cruel and unusual punishment. Plaintiff further claims that Killian violated his right to due process by failing to provide an impartial panel, and signing off as the committee chairperson of the hearing without being present.

Here, Killian's refusal to have a discussion with plaintiff on a single occasion does not demonstrate deliberate indifference, especially in light of plaintiff's failure to adequately allege any underlying retaliation in the first place. It is worth noting that plaintiff attempted to speak with Killian on February 24, 2019, shortly before the February 26, 2019 treatment team hearing, of which Killian was the chairperson. Plaintiff does not demonstrate how Killian violated the constitution by refusing to talk to him about issues that would be raised at an upcoming hearing before that hearing took place.

Meanwhile, plaintiff's statement that "Killian's actions resulted in cruel and unusual punishment" is an unsupported conclusion. As such, the Court is free to ignore it. Additionally, the statement does nothing to connect Killian's actions with a constitutional violation. *See Madewell*, 909 F.2d at 1208 (stating that § 1983 liability "requires a causal link to, and direct responsibility for, the deprivation of rights").

Finally, plaintiff's due process claims fail because he has not identified a liberty interest. As previously noted, if plaintiff does not identify a liberty interest, "it does not matter whether one

45

has received due process or not." *Singleton*, 155 F.3d at 987. In this case, the treatment team hearing that plaintiff references resulted in his termination from MOSOP. However, plaintiff does not have a liberty interest in participating in MOSOP. *See Jones*, 996 F.2d at 946. *See also Persechini*, 651 F.3d at 808 (stating that plaintiff "did not have a protected liberty interest in the discretionary probationary release to which he would have become eligible had he successfully completed" MODOC's long-term substance abuse treatment program). Because there is no liberty interest at stake, the Court need not reach the question of what process was due, and plaintiff's allegations regarding Killian's role in his hearing do not state a constitutional claim. Therefore, the claims against Killian must be dismissed.

### xvi.    Caseworker White

Plaintiff alleges that Caseworker White, acting in an individual capacity, violated his right to due process in the following ways: by failing to provide a fair and impartial hearing panel; by allowing "the hearing to stray from the written reason for the hearing;" by failing to provide a written statement of evidence relied upon; and by failing to provide exculpatory evidence.

Plaintiff's allegations against White, such as they are, comprise a list of legal conclusions. There is not a single fact showing what White actually did or did not do to violate plaintiff's constitutional rights. Such conclusory pleadings are insufficient to state a claim. *See Hamilton*, 621 F.3d at 817-18 (explaining that to state a cause of action, "[a] pleading that merely pleads labels and conclusions, or a formulaic recitation of the elements of a cause of action, or naked assertions devoid of factual enhancement will not suffice").

Moreover, similar to Caseworker Killian above, plaintiff's due process claim fails because he has not identified a liberty interest. He has not, for instance, alleged an "atypical and significant hardship…in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484. Moreover,

plaintiff does not have a liberty interest in participating in MOSOP. *See Jones*, 996 F.2d at 946. He also does not have a liberty interest in the possibility of parole. *Adams*, 405 F.3d at 645. Because there is no liberty interest at issue, the alleged shortcomings of the treatment team hearing do not implicate the due process clause. Therefore, plaintiff's claims against White must be dismissed.

### xvii.    Assistant Division Director O'Kelley

Plaintiff alleges that Assistant Division Director O'Kelley, acting in his individual capacity, failed to ensure he received due process, failed to provide fair and impartial hearings, failed to train his subordinates, and "failed to investigate the behaviors of Gould and Pfister."

The allegations against O'Kelley comprise a list of legal conclusions, without any factual support. As such, they fail to state a claim. *See Hamilton*, 621 F.3d at 817-18 (explaining that to state a cause of action, "[a] pleading that merely pleads labels and conclusions, or a formulaic recitation of the elements of a cause of action, or naked assertions devoid of factual enhancement will not suffice"). Furthermore, his due process claim fails because, as discussed above, he has not identified a protected liberty interest, meaning that "it does not matter whether one has received due process or not." *Singleton*, 155 F.3d at 987.

Finally, any suggestion that O'Kelley failed to investigate plaintiff's complaints about Gould and Pfister are belied by his own pleadings. Plaintiff acknowledges that he maintained correspondence with O'Kelley for over a year. He has also attached a number of letters from O'Kelley, showing that O'Kelley responded to both plaintiff and his family. These responses include questions that O'Kelley submitted to Gould based on plaintiff's concerns. There is nothing to indicate that O'Kelley's actions were inappropriate, much less violative of plaintiff's constitutional rights. Therefore, plaintiff's claims against O'Kelley must be dismissed.

### D.  Preservice Dismissal

Pursuant to 28 U.S.C. § 1915, the Court is required to dismiss a complaint any time it determines that the action is frivolous, malicious, or fails to state a claim. 28 U.S.C. § 1915(e)(2). Here, the official capacity claims against the MODOC employees must be dismissed because plaintiff has not established that MODOC or the State of Missouri was the "moving force" behind his constitutional deprivation. Similarly, the official capacity claims against the Corizon employees fail because plaintiff has not shown that there was a Corizon policy, custom, or official action that inflicted an actionable injury. Finally, as discussed in detail above, plaintiff's individual capacity claims against each defendant fails to state a claim upon which relief can be granted. Therefore, this action must be dismissed without prejudice.

### E.  Second Motion to Appoint Counsel

Plaintiff has filed a second motion to appoint counsel. (Docket No. 9). The motion will be denied as moot as this action is being dismissed without prejudice for failure to state a claim. *See* 28 U.S.C. § 1915(e)(2)(B).

### F.  Motion for Preliminary Injunction and Temporary Restraining Order

Plaintiff has filed a motion for a preliminary injunction and temporary restraining order. (Docket No. 10). The motion consists of seventeen handwritten pages. There are a further twenty-two pages of attachments, which consist of documents relating to plaintiff's participation in MOSOP.

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 557 U.S. 7, 27 (2008). In determining whether to grant a preliminary injunction, a district court applies "a flexible consideration of (1) the threat of irreparable harm to the moving party; (2) balancing this harm with any injury an injunction would inflict on other

48

interested parties; (3) the probability that the moving party would succeed on the merits; and (4) the effect on the public interest." *St. Louis Effort for AIDS v. Huff*, 782 F.3d 1016, 1021 (8th Cir. 2015).

In the prison context, a request for injunctive relief must always be viewed with great caution because "judicial restraint is especially called for in dealing with the complex and intractable problems of prison administration." *Goff v. Harper*, 60 F.3d 518, 520 (8th Cir. 1995). For an injunction to issue, "a right must be violated" and the court must determine whether "a cognizable danger of future violation exists and that danger must be more than a mere possibility." *Id*. at 521. Regarding the issue of whether a situation is ripe for injunctive relief, the Eighth Circuit has noted that courts "should not get involved unless either a constitutional violation has already occurred or the threat of such a violation is both real and immediate." *Id*. The burden of proving that a preliminary injunction should be issued rests with the party seeking injunctive relief. *Mgmt. Registry, Inc. v. A.W. Cos., Inc.*, 920 F.3d 1181, 1183 (8th Cir. 2019).

Here, plaintiff's motion for a preliminary injunction and temporary restraining order substantially repeats the allegations in his lengthy amended complaint. The motion focuses on a time period beginning in May 2018, after plaintiff had been reinstated to MOSOP. Upon rejoining the program, plaintiff began complaining about his treatment, especially to Assistant Division Director O'Kelley. Plaintiff was joined in his complaints by family members, including his mother and grandmother, who separately contacted officials regarding plaintiff's progress in MOSOP.

Plaintiff contends, as he did in the amended complaint, that defendants, particularly Assistant Clinical Director Gould and Manager of MOSOP Operations Pfister, retaliated against him for making these grievances. Ultimately, plaintiff states that the retaliation took the form of his termination from MOSOP.

Plaintiff further alleges that the actual treatment team hearing violated his right to due process. In particular, he claims he was denied the procedural safeguards required by *Wolf v. McDonnell*, 418 U.S. 539 (1974). He also asserts that the Missouri Board of Probation and Parole created a liberty interest when it gave him a time credit release date.

Plaintiff's motion for a preliminary injunction and temporary restraining order must be dismissed because plaintiff has not demonstrated a likelihood of success on the merits. Indeed, as discussed more fully above, plaintiff has failed to state a claim upon which relief can be granted, and his action is subject to dismissal. The retaliation allegations that plaintiff repeats in the motion do not establish a causal connection between defendants' purported retaliatory animus and his injury. *See Small*, 708 F.3d at 1008.

Moreover, despite plaintiff's suggestion to the contrary, he does not have a protected liberty interest in parole. *See Adams*, 405 F.3d at 645 (explaining "that an inmate does not have a constitutionally-protected liberty interest in the possibility of parole, and…that the Missouri parole statutes create no liberty interest under state law in the parole board's discretionary decisions"). Likewise, he has no liberty interest in his participation in MOSOP. *See Jones*, 996 F.2d at 946 (holding that inmate "did not have a liberty interest in participating in MOSOP at the time he desired to do so"). It is only after a liberty interest has been established that a court must determine the process necessary to protect that interest. *See Williams*, 662 F.3d at 1000. That is, a court "need reach the question of what process is due only if the inmates establish a constitutionally protected liberty interest." *See Beaulieu*, 690 F.3d at 1047. *See also Singleton*, 155 F.3d at 987 (explaining that to claim a due process violation, plaintiff has to be deprived of either life, liberty, or property, otherwise "it does not matter whether one has received due process or not"). Because plaintiff has

50

not established a liberty interest, the Court does not need to review the alleged procedural flaws in the hearing that plaintiff broaches.

For the reasons discussed above, plaintiff's motion for a preliminary injunction and temporary restraining order must be denied.

Accordingly,

**IT IS HEREBY ORDERED** that plaintiff's second motion for appointment of counsel (Docket No. 9) is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that plaintiff's motion for a preliminary injunction and temporary restraining order (Docket No. 10) is **DENIED**.

**IT IS FURTHER ORDERED** that this action is **DISMISSED** without prejudice for failure to state a claim. *See* 28 U.S.C. § 1915(e)(2)(B). A separate order of dismissal will be entered herewith.

**IT IS FURTHER ORDERED** that an appeal from this dismissal would not be taken in good faith.

Dated this 11th day of May, 2020.

*John A. Ross*
_____
**JOHN A. ROSS**
**UNITED STATES DISTRICT JUDGE**